NOT FOR PUBLICATION                    (Docket Entry Nos. 353, 354, 357)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

———————————————————— :
McKOWAN LOWE & CO., LTD.,         :
                                 :
              Plaintiff,         :    Civil No. 94-5522 (RBK)
                                 :
        v.                       :    **OPINION**
                                 :
JASMINE, LTD., et al.,           :
                                 :
              Defendants.        :
———————————————————— :
                                 :
HARRY BERGER, individually       :
and on behalf of a class         :
similarly situated,              :
                                 :
              Plaintiff,         :    Civil No. 96-2318 (RBK)
                                 :
        v.                       :
                                 :
JASMINE, LTD., et al.,           :
                                 :
              Defendants.        :
———————————————————— :


**KUGLER**, United States District Judge:

         This securities fraud class action, brought by
disappointed shareholders of Jasmine, Ltd., arises out of alleged
misrepresentations and omissions in the registration statement
and prospectus filed by Jasmine in connection with its 1993
initial public offering.  The class claims arise under sections
11 and 12(a)(2) of the Securities Act of 1933.  The claims of

individual plaintiffs Harry Berger and Bernard Cutler arise under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, the New Jersey Uniform Securities Law (1997), and common law theories of fraudulent and negligent misrepresentation.  Berger also asserts claims under the Illinois Securities Law of 1953 and the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act").

Before the Court are motions for summary judgment by (1) defendant Arthur Andersen LLP ("Andersen"), who audited Jasmine's 1993 financial statements; (2) defendants Sands Brothers & Co., who underwrote Jasmine's IPO, and Steven Sands and Martin Sands, who were principals of Sands Brothers (collectively, "Sands" or the "Sands Defendants"); and (3) plaintiffs Cutler (individually and on behalf of the class) and Berger.  Andersen and Sands move for summary judgment on all claims against them.[1]  Plaintiffs' summary judgment motion,

---

[1] Andersen is a defendant: (1) to the class claim under section 11; (2) to Berger and Cutler's individual claims under section 10(b) and Rule 10b-5, New Jersey securities law, and common law theories of fraudulent and negligent misrepresentation; and (3) to Berger's individual claim under the Illinois Consumer Fraud Act.

Sands is a defendant: (1) to the class claims under sections 11 and 12(a)(2); (2) to Berger and Cutler's individual claims under section 10(b) and Rule 10b-5, New Jersey securities law, and common law theories of fraudulent and negligent misrepresentation; and (3) to Berger's individual claims under the Illinois Consumer Fraud Act and Illinois securities law. Rather than submitting a separate brief, the Sands Defendants "adopt[ed] and incorporate[d]" Andersen's brief with no

brought against all defendants,[2] is limited to the class claims under sections 11 and 12(a)(2).

For the reasons expressed in this opinion, Andersen's motion for summary judgment on all claims will be granted in part and denied in part; the Sands Defendants' motion for summary judgment on all claims will be granted in part and denied in part; and the plaintiffs' motion for summary judgment will be denied.

I.      **UNDISPUTED FACTS**

   A.   **BACKGROUND**

Before it went public in 1993, Jasmine was a family-run importer and wholesaler of ladies' shoes and handbags.  Jasmine imported product from the Far East through a Hong Kong purchasing agent, McKowan Lowe & Co., Ltd., and sold it to department stores, catalog retailers, and home shopping networks.

At the time Jasmine went public, defendant Irving M. Mangel was Jasmine's CEO, Chairman of the Board, and one of its Directors.  Defendant Samuel J. Mangel was Jasmine's Managing Director - Overseas Production and Sourcing, Vice President,

---

additional argument.

   [2] Other than Andersen and the Sands Defendants, the remaining defendants in this case are McKowan Lowe & Co., Ltd., Tony Ngai, and Evelyn Wong (the "McKowan Defendants"); and Samuel Mangel, Irving Mangel, Edward Maskaly, Melvin Twersky, and Thomas Ciocco (the "Jasmine Defendants").

Secretary, and one of its Directors.  Defendant Edward W. Maskaly
was Jasmine's Managing Director - Finance/Administration, CFO,
and one of its Directors.  Defendant Melvin Twersky was Jasmine's
Managing Director - Sales and Marketing and one of its Directors.
Defendant Thomas Ciocco was Jasmine's controller.

Also at the time Jasmine went public, defendant Evelyn
Wong was McKowan Lowe's Director of Finance, and defendant Tony
Ngai was McKowan Lowe's Senior Director.

In July 1993, Jasmine retained Andersen to audit
Jasmine's financial statements for the fiscal year ending
September 30, 1993.  Andersen's November 22, 1993 unqualified
report on Jasmine's fiscal year 1993 financial statements was
later included in the Registration Statement and Prospectus for
Jasmine's initial public offering.  Andersen did not audit
Jasmine's 1994 financial statements, nor did it audit Jasmine's
quarterly 1993 financial statements.

On December 15, 1993, 1,667,667 shares of Jasmine
common stock were offered to the public at $5.50 per share.
Defendant Sands Brothers was the underwriter for the IPO;
defendants Steven and Martin Sands were principals of Sands
Brothers at that time.

Jasmine's stock traded publicly on the NASDAQ exchange.
It quickly rose above the IPO price and remained there until mid-
February 1994. Plaintiff Cutler bought his 1000 shares on

December 16, 1993, during the IPO.  Plaintiff Berger bought his 2700 shares on January 11, 1994 at $6 7/8 per share.  Both Berger and Cutler still held their Jasmine stock when the present summary judgment motions were filed.

Jasmine's shares closed on February 14, 1994 at $5.75. On February 15, 1994, Jasmine filed its first-quarter 1994 financial report with the SEC on Form 10-Q.[3]  In this report, Jasmine reported that net sales for the quarter ended December 31, 1993 were $3,804,000, compared to net sales of $6,137,000 during the quarter ended December 31, 1992.  Jasmine also reported that the net loss for the quarter ended December 31, 1993 was $1,054,000, compared to a net loss of $328,000 during the quarter ended December 31, 1992.  (See Third Am. Compl. Ex. B at 2.)  That day, Jasmine's stock fell almost 24% to $4.375.

Jasmine's shares then entered a period of gradual decline, falling to $4.125 by the end of February.  By the end of March they were at $3.375 and, by the end of April, $3.125.

On May 12, 1994, Jasmine filed its second quarterly report, disclosing that Jasmine had lost $1.4 million before taxes during the six months ended March 31, 1994.  The report also disclosed (1) that Jasmine had terminated its agency agreement with McKowan Lowe, which was the source of virtually

---

[3] Jasmine's quarterly financial statements presented in its Form 10-Q reports were unaudited.  (See Rev. Third Am. Compl. Exs. B, C.)

all of Jasmine's product supply; and (2) that, although McKowan
Lowe still owed Jasmine $856,000, in the form of a promissory
note, it was unlikely to be collected.  That day, the price of
Jasmine's common stock closed down an eighth, to $2.50.

Jasmine's shares stood at $2.125 at the end of June
1994.  During July and August 1994, the shares fell to a low of
$1.75, which was also the price on December 1, 1994.  The price
of Jasmine's stock had thus declined $3.75 per share from the IPO
price.

On November 3, 1994, McKowan Lowe filed a complaint
against Jasmine and others, alleging that Jasmine owed it a debt
of $14,703,296 ("McKowan Lowe Lawsuit").  Jasmine disclosed the
lawsuit on Form 8-K on Friday, December 2, 1994.  Jasmine's stock
price did not react until Monday, December 5, 1994, when it
declined by $0.75 to $1.00.  The stock recovered most of the
decline within the week, closing at $1.50 on December 8, before
resuming a downward trend.

The termination of Andersen's services with Jasmine was
disclosed on Form 8-K on December 19, 1994.  In the Form 8-K,
Jasmine's management stated that "[c]ertain of the allegations in
the [McKowan Lowe Lawsuit] were inconsistent with representations
previously made by management and by [McKowan Lowe] in the
lawsuit . . . ."  Jasmine's stock price was unchanged at $1.00
per share following this disclosure.

Jasmine's stock was last publicly traded on March 22, 1995, at $0.50 per share.

BDO Seidman succeeded Andersen as Jasmine's independent auditor.  On June 20, 1995, BDO Seidman filed a letter with the SEC asserting that Jasmine's 1993 and 1994 financial statements were potentially misstated.  According to the plaintiffs, this letter "was the first public disclosure that the 1993 Financial Statements, which were incorporated in [Jasmine's] Prospectus, may have contained material misstatements or omissions."  (Am. Class Action Compl. ¶ 64.)

McKowan Lowe dismissed the McKowan Lowe Lawsuit with prejudice on February 18, 1999; however, the record contains some evidence that Jasmine owed McKowan Lowe a debt greater than that reflected in the financial statements included in Jasmine's registration statement and prospectus.[4]

**B.   PROCEDURAL HISTORY**

On November 27, 1995, plaintiff Harry Berger's counsel filed a purported class action lawsuit against Jasmine, McKowan Lowe, and others in the Northern District of Illinois.  Venue was transferred to the District of New Jersey on April 23, 1996.  The Honorable Joseph H. Rodriguez denied Berger's motion for class certification on August 5, 1998, holding that Berger was neither

_____

[4] (See Moynihan Decl. Ex 28 at Exs. C-E, Ex. 29 at Exs. E-F.)  Andersen argues that this evidence has never been properly authenticated, and is inadmissible hearsay as against Andersen.

7

adequate nor typical as a class representative.  Berger remains in this litigation as an individual plaintiff.

On July 15, 1999, Berger filed an amended class action complaint naming Bernard Cutler as an additional plaintiff. Cutler later successfully moved for certification of a class asserting claims under sections 11 and 12(2) of the Securities Act of 1933.  The class is composed of those persons who purchased shares of Jasmine common stock from December 15, 1993 through June 20, 1995.  The remainder of the claims in this action are asserted by Berger and/or Cutler individually.

### C.   MISSTATEMENTS IN 1993 FINANCIAL STATEMENTS

Plaintiffs retained Mr. Harvey Moskowitz, a former partner in BDO Seidman, as an expert witness to opine on Andersen's conduct in performing the audit of Jasmine's 1993 financial statements.  Moskowitz concluded that Andersen's audit did not comply with Generally Accepted Auditing Standards ("GAAS"), and that Andersen's failure to comply with GAAS led to its failure to discover and report material misstatements in Jasmine's 1993 financial statements.  (Moskowitz Report Ex. I at 10.)  However, Moskowitz nowhere opined that Andersen had been reckless or fraudulent.

Plaintiffs seek to hold Andersen liable for the following alleged misrepresentations in Jasmine's 1993 financial statements ("Misrepresentations"):

8

1.    The "McKowan Lowe Payable," a debt owed by Jasmine to McKowan Lowe, which plaintiffs allege was understated by $13.3 million — Moskowitz opined that Andersen "failed to properly corroborate" the representations of Jasmine's management as to the amount of the debt[5] (Moskowitz Report Ex. I. at 14);

2.    The "McKowan Lowe Credits," credits issued to Jasmine by McKowan Lowe, which Plaintiffs claim were unrealizable and improperly used to "offset" the true amount of the McKowan Lowe Payable — Moskowitz opined that Andersen failed to properly test these credits (id. at 26);

3.    The "Lucky Leader Transaction," Jasmine's sale of an option to buy Lucky Leader, a Hong-Kong based entity, to McKowan Lowe, which Plaintiffs claim was either a sham transaction that overstated Jasmine's 1993 operating income by $1,159,586 or was not accounted for properly under GAAP — Moskowitz opined that Andersen failed adequately to test the validity of the transaction (id. at 33) and, if the transaction was valid, should not have approved Jasmine's recognition of the entire resulting gain as income for fiscal year 1993 (id. at 36);

4.    The "Angie's Receivable," a $418,242 account receivable from a company called Angie's Shoe and Leather that

_____

[5] Moskowitz "[didn't] feel comfortable" providing "a definitive number or even a range," as to the amount by which the McKowan Lowe Payable had been misstated, but testified at deposition that the understatement was "very material."

Plaintiffs claim was fictitious and/or uncollectible — Moskowitz
opined that Andersen failed to perform an adequate audit
procedure as to the existence of the Angie's Receivable (id. at
37);

     5.    The "Factory Credits," reductions worth $422,239
in the cost of future purchases, provided to Jasmine by certain
of Jasmine's factories, which plaintiffs claim were fictitious,
unrealizable, and/or not accounted for properly under GAAP —
Moskowitz opined that Andersen failed adequately to test the
validity of these credits and, if the credits were valid, should
not have approved Jasmine's full recognition of the credits
during fiscal year 1993 (id. at 29);

     6.    The "Shoe Premier Sales," sales of $2.3 million
to an "Asian shoe liquidator" called Shoe Premier, which
plaintiffs claim were fictitious or not accounted for properly
under GAAP — Moskowitz opined that Andersen "failed to exercise
appropriate skepticism and due care" in auditing these
transactions (id. at 39); and

     7.    Jasmine's operating income, the foreign aspect of
which plaintiffs claim was understated by $636,000, and the
domestic aspect overstated by $636,000, due to improper
accounting for the Shoe Premier Sales — Moskowitz did not
identify these alleged misstatements in his report, and later
refused to opine that they were material.  (See Moskowitz Dep.

61:11.)

Moskowitz testified that he did not express an opinion as to whether the Angie's Receivable or the Shoe Premier Sales caused Jasmine's 1993 financial statements to be materially misstated.  (See id. at 53:13-14, 57:11-12.)

### D.   CORNELL REPORT

Andersen retained Dr. Bradford Cornell to analyze Jasmine's stock performance from the time of the IPO until Jasmine stopped public trading.  Dr. Cornell conducted an event study[6] to determine "the relationship between stock price movements and the alleged misstatements and omissions that the plaintiffs assert are contained in Jasmine's fiscal 1993 financial statements."  (Cornell Report at 12.)  The event study gathered all of the Jasmine-related news that was published from December 15, 1993 through November 11, 1995, including Jasmine's SEC filings, press releases and other disclosures, and news items relating to Jasmine.

Dr. Cornell analyzed the reaction of Jasmine's stock price to the release of each new piece of information.  Based on

---

[6] "An event study is an analysis of the relationship between news announcements and other public disclosures related to a particular company and changes in the company's daily stock price and trading volume.  An index representing either the market as a whole, or the industry in which the subject company operates, is often used to filter out subject company price movements that have been caused by market or industry-wide effects."  (Cornell Report at 10-11.)

11

this analysis, he concluded that neither the plaintiff class
(under section 11) nor plaintiffs Berger and Cutler (under
section 10 and Rule 10b-5) suffered any damages "arising from
[Andersen's] purported failure to disclose alleged misstatements
and omissions in its audit opinion with respect to Jasmine's
financial statements for the period ended September 30, 1993."
(Cornell Report at 32.)

Upon review of all Jasmine-related news that occurred
during the class period, Dr. Cornell concluded that "[t]here were
no news disclosures relating to plaintiffs' fraud allegations"
between December 16, 1993 and December 1, 1994.  (Cornell Report
at 13; see also Cornell Dep. at 160, 184.)  Rather, said Dr.
Cornell, "[t]he news disclosures that occurred during this
period," including Jasmine's unaudited quarterly financial
reports, "were related to Jasmine's business fundamentals."
(Cornell Report at 12-13; see also Cornell Dep. at 176.)  Dr.
Cornell thus determined that "the revelation of fraud alleged by
plaintiffs could not have caused Jasmine's stock price decline
between December 16, 1993 and December 1, 1994 because there were
no disclosures of any errors or irregularities with respect to
Jasmine's fiscal 1993 financial statements during this period."
(Cornell Report at 15.)

Dr. Cornell found that Jasmine's $1.375 price decline
following the disclosure of its first quarter 1994 financial

results on February 15, 1994 "was the only statistically significant price decline that Jasmine experienced between December 16, 1993 and December 1, 1994."  However, according to Cornell:

> I do not understand plaintiffs to contend that those results disclosed in any way any of the alleged fraud and, hence, it is reasonable to conclude that the loss of investor value that occurred on that day was caused solely by news unrelated to the alleged fraud, and is hence not recoverable as damages.

(Cornell Report at 13-14.)

Dr. Cornell also found that the $0.75 price decline following Jasmine's disclosure of the McKowan Lowe Lawsuit on December 2, 1994 was statistically significant.  (Cornell Report Ex. 4 at 19 (showing t-statistic of -3.640 for Jasmine's December 5, 1994 residual return).[7])  However, Dr. Cornell opined:

> [I]nvestors would not be able to infer the merits of McKowan Lowe's allegations from this disclosure, although they would have been put on notice regarding potential undisclosed debt of $13.3 million.  Thus, Jasmine's stock price decline on December 5 most likely represents the market's provision of a reserve for three uncertainties: the potential that McKowan Lowe's allegations were true; the estimated probability that Jasmine would at some point have to pay a

---

[7] "If the absolute value of a given t-statistic is greater than or equal to 1.96, there is a 95% chance that the associated residual return is not equal to zero, which greatly increases the likelihood that, when taken as a whole, any news disclosed on that particular trading day was material to investors."  (Cornell Report at 11.)

> settlement or judgment; and an estimate of
> costs, such as legal fees, that Jasmine would
> incur to defend itself.

(Cornell Report at 16.)  Dr. Cornell explained the concept of a

"reserve":

> Price declines which are caused by the
> market's provision for uncertainty do not
> themselves reflect precise measurement of
> damages related to fraud.  For example, if
> the stock price goes down substantially due
> to uncertainty about a negative news
> disclosure, but later the uncertainty is
> resolved and it turns out that there are no
> negative effects on the company, the stock
> price should rise by the amount of the
> uncertainty reserve, all other things being
> held equal.

(Cornell Report at 16.)  Because "[t]he allegation that there was

a $13.3 million debt owing from Jasmine to McKowan Lowe was

[later] dropped" when McKowan Lowe dismissed its lawsuit against

Jasmine with prejudice in 1999, Dr. Cornell concluded that the

"purported failure of [Andersen's] audit opinion to disclose the

existence of an alleged debt owing from Jasmine to McKowan Lowe

in the amount of $13.3 million" did not cause plaintiffs' loss.

(Cornell Report at 17.)

Dr. Cornell also gave an opinion as to plaintiffs'

assertion that Jasmine's June 20, 1995 Form 8-K SEC filing "was

the first public disclosure that the 1993 Financial Statements,

which were incorporated in the Prospectus, may have contained

material misstatements or omissions."  (See Am. Class Action

Compl. ¶ 64.)  Observing that "[t]he market can only react to

14

news when it is revealed," Dr. Cornell reasoned that, assuming

the truth of plaintiffs' assertion, "any decline in Jasmine's

stock price prior to their first alleged disclosure date of June

20, 1995 will necessarily have occurred in response to market-

wide or company-specific information unrelated to any frauds."

(Cornell Report at 25.)

> Therefore, Jasmine's stock price decline from
> $5.50 at its initial public offering to $0.50
> on March 22, 1995 was not caused by the
> revelation of any alleged frauds.  Stock
> price data beyond March 22 are not available
> because of Jasmine's NASDAQ delisting on
> March 23, 1995.  However, any further drops
> in Jasmine's stock price occurring before
> June 20, 1995 also would not have been caused
> by fraud revelation.

(Cornell Report at 25.)

### E.   SCHWEIHS REPORT

Plaintiffs retained Robert Schweihs as an expert to

respond to the section of Dr. Cornell's report pertaining to

plaintiffs' damages under section 11.  Schweihs did not opine as

to plaintiffs' damages under section 10 and Rule 10b-5 or under

state law.

Schweihs criticized Dr. Cornell's event study in two

ways.  First, Schweihs opined that the event study should have

used a start date that preceded the alleged fraud.  Second,

Schweihs disagreed with the selection of companies used by Dr.

Cornell to determine the effect of industry-wide factors on

Jasmine's stock price.  Schweihs admitted that these flaws did

15

not cause Dr. Cornell to fail to identify any other significant news items affecting Jasmine's stock price.  He also admitted that he had performed no independent event study to determine whether the flaws had affected Dr. Cornell's results.

As to Dr. Cornell's opinion that the Misrepresentations could not have caused plaintiffs' loss before December 1, 1994 because none of the Misrepresentations were disclosed to the market during the relevant time period, Schweihs opined:

> Even though acts of fraud were not disclosed to the investing public prior to December 1, 1994, the allegedly inflated historical financial results set investor expectations for the future performance of the Jasmine stock price.  As the announced post-IPO financial results compared unfavorably with the allegedly overstated pre-IPO financial results, the Jasmine stock price declined.

(Schweihs Report at 5.)  To illustrate, Schweihs focused on the 24% decline in Jasmine's stock price following the February 15, 1994 release of its first quarter 1994[8] financial results: "Jasmine's December 31, 1993 results would not have been as disappointing when compared to the December 31, 1992 results if only the December 31, 1992 [i.e., first quarter 1993] results had not be[en] overstated."  (Id.)

As to Dr. Cornell's opinion that the $0.75 share price decline on December 5, 1994 following disclosure of the McKowan

---

[8] Jasmine's first quarter (fiscal) 1994 results were for the quarter ended December 31, 1993.

16

Lowe Lawsuit represented a "market reserve" that was corrected
when McKowan Lowe dismissed its suit with prejudice, Schweihs
responded:

> While the $0.75 per share price decline may
> have reflected the market's provisions for
> "uncertainties" regarding the McKowan
> lawsuit, the more important point is that no
> such decline in the stock price would have
> occurred if the McKowan debt was not omitted
> from [Jasmine's] historical financial
> statements, as alleged by plaintiffs.

However, Schweihs also opined that the December 5, 1994 price
decline "could have been a result of investors' view of a number
of different things besides just that lawsuit." (Schweihs Dep. at
102.)

### F.   ANDERSEN'S EXPERTS

Andersen obtained the expert opinions of William
Westerfield, a retired PriceWaterhouse Coopers audit partner, and
Dr. Steve Albrecht, Associate Dean of the Marriott School of
Management at Brigham Young University, as to whether Andersen's
audit of Jasmine's 1993 financial statements complied with GAAS.
Westerfield opined that Andersen conducted its audit in
accordance with GAAS.  Dr. Albrecht testified that Andersen could
not have detected the alleged fraud following GAAS procedures.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate where the Court is
satisfied that "there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.

The moving party must first satisfy a burden of production, which "requires the moving party to make a prima facie showing that it is entitled to summary judgment."  Celotex, 477 U.S. at 331.  Where the burden of persuasion at trial would be on the nonmoving party, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id.  If the moving party has not fully discharged its initial burden of production, its motion for summary judgment must be denied.  Id. at 332.

III.     **DEFENDANTS SANDS AND ANDERSEN'S MOTIONS FOR SUMMARY JUDGMENT**

    A.   **LOSS CAUSATION**

       1.   **Rule 10b-5**

For the purposes of their motion for summary judgment on plaintiffs' Rule 10b-5 claims, Andersen and Sands do not challenge plaintiffs' assertion that Jasmine's registration statement and prospectus contained material misrepresentations. Instead, Andersen and Sands argue that they are entitled to summary judgment because the record contains inadequate evidence of loss causation.

Loss causation, on which the burden of proof rests with the plaintiff, is an essential element of a 10b-5 case. See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 177 (3d Cir. 2001). To satisfy the element of loss causation, a plaintiff must "establish that the alleged misrepresentations proximately caused the decline in the security's value." See Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000). To establish proximate cause, "it is not sufficient to show inflation caused by a misrepresentation and subsequent loss." See In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 690 (E.D. Pa. 2001). Rather, a plaintiff must provide "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." Robbins v. Koger Props., Inc., 116 F.3d 1441, 1448 (11th

Cir. 1997) (emphasis added), <u>cited with approval in</u> <u>Semerenko</u>, 223 F.3d at 185.  In other words, a plaintiff must provide a "basis to distinguish between the fraud-related and non-fraud related influences of the stock's price behavior."  <u>See</u> <u>In re Imperial Credit Indus., Inc. Sec. Litig.</u>, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003).

Loss causation thus "describes the link between the defendant's misconduct and the plaintiff's economic loss." <u>Robbins</u>, 116 F.3d at 1447.  "Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation."  <u>Semerenko</u>, 223 F.3d at 185.  "In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price."  <u>Semerenko</u>, 223 F.3d at 186.

"The price decline before disclosure [of the fraud] may not be charged to defendants."  <u>Akerman v. Oryx Communications, Inc.</u>, 810 F.2d 336, 342 (2d Cir. 1987).  Disclosure of the fraud need not originate with a defendant, and may be indirect; that is, through disclosure of another event.  However, in that case, plaintiffs must provide proof that the market recognized a relationship between the event disclosed and the fraud.  <u>See</u>

IKON, 131 F. Supp. 2d at 690 (citing Robbins, 116 F.3d at 1448).
The key is for the plaintiffs to demonstrate that the "artificial
inflation" caused by the fraud "was removed from the market price
of [the] stock, thereby causing a loss."  See Semerenko, 223 F.3d
at 185.

Plaintiffs argue that Jasmine's statistically
significant residual returns following (1) Jasmine's February 15,
1994 disclosure of its first-quarter 1994 financial results, and
(2) Jasmine's December 2, 1994 disclosure of the McKowan Lowe
Lawsuit, are sufficient evidence of loss causation to survive
summary judgment.

### a.    Misrepresentations Other Than the McKowan Lowe Payable ("Other Misrepresentations")

Andersen and Sands argue that the Misrepresentations
other than the McKowan Lowe Payable ("Other Misrepresentations")
could not have caused the plaintiffs' loss because they were not
disclosed — directly or indirectly — to the market during the
relevant time period.  If the investing public never knew about
the Other Misrepresentations, Andersen and Sands reason, any
decline in price could not have been caused by the Other
Misrepresentations, as "[t]he market can only react to news when
it is revealed."  Thus, Andersen and Sands conclude, a lack of
disclosure is tantamount to a lack of loss causation.  Plaintiffs
respond to this argument in two ways.

First, the plaintiffs dub "nonsensical" defendants'
position that there can be no loss causation absent disclosure of
the fraud.[9]  (See Pls.' Opp. at 1, 12.)  However, because "[t]he
market can only react to news when it is revealed" (Cornell
Report at 25), the price of Jasmine's stock could not have fallen
as a result of the Misrepresentations unless the market knew
about the Misrepresentations — that is, unless the
Misrepresentations had directly or indirectly been disclosed to
the market.[10]  See IKON, 131 F. Supp. 2d at 691 ("If the . . .

---

[9] As support for their position that loss causation under
Rule 10b-5 does not require proof of disclosure to the market,
plaintiffs cite In re Worlds of Wonder Securities Litigation, 35
F.3d 1407, 1422 (9th Cir. 1994).  However, Worlds of Wonder
stands only for the proposition that, where a misrepresentation
was indirectly revealed to the market through public disclosures,
a defendant cannot meet his burden of establishing "negative
causation" under section 11 by showing that a misrepresentation
was never directly, expressly disclosed by that defendant.  See
Worlds of Wonder, 35 F.3d at 1422.

[10] Andersen correctly points out, notwithstanding
plaintiffs' argument to the contrary, that the market could not
have somehow "corrected" Jasmine's stock price before investors
learned of the Misrepresentations.  "[W]hat is a market if not
the sum of investors?" (Andersen's Reply at 7 n.9.)  "Plaintiffs
cite no case holding that an 'indirect disclosure' to the market
may occur while the investing public somehow remains unaware of
the disclosure." (Id.)

This conclusion is bolstered by the efficient market
hypothesis, upon which the plaintiffs implicitly rely to
demonstrate reliance on the information contained in Jasmine's
registration statement and prospectus.  See, e.g., Eugene F.
Fama, Efficient Capital Markets: II, 46 Journal of Finance 1575,
1575 (1991) ("I take the market efficiency hypothesis to be the
simple statement that security prices fully reflect all available
information.").

misstatements were successfully covered up, they were never disclosed to the market and therefore could not have caused a loss."). Thus, plaintiffs' first argument is unpersuasive. Loss causation requires disclosure.

Second, the plaintiffs dub "laughable" defendants' position that none of the Other Misrepresentations were disclosed to the market during the relevant time period. (Pls.' Opp. at 2.) According to the plaintiffs, Jasmine's first quarter 1994 financial results disclosed the Other Misrepresentations. Because the February 2, 1994 release of Jasmine's first quarter 1994 results was followed by a statistically significant decrease in Jasmine's stock price, the plaintiffs argue that they have adduced sufficient evidence of loss causation to survive summary judgment on their Rule 10b-5 claims as to the Other Misrepresentations.

In support of their contention, the plaintiffs cite Schweihs's opinion that "the allegedly inflated historical financial results set investor expectations for the future performance of the Jasmine stock price. As the announced post-IPO financial results compared unfavorably with the allegedly overstated pre-IPO financial results, the Jasmine stock price declined." Schweihs's opinion is, therefore, that Jasmine's first quarter 1994 results disclosed the Other Misrepresentations because they compared poorly with Jasmine's first quarter 1993

results.

However, in order to demonstrate that Jasmine's first quarter 1994 financial results indirectly disclosed the Misrepresentations, the plaintiffs have the burden of demonstrating that the market recognized a relationship between Jasmine's first quarter 1994 financial results and the Other Misrepresentations. See IKON, 131 F. Supp. 2d at 690. The plaintiffs have not met this burden.

Although the Schweihs Report is evidence that the market recognized a relationship between Jasmine's first quarter 1994 results and its first quarter 1993 results, the Report nowhere connects Jasmine's first quarter 1993 results to any of the Misrepresentations. Rather, Schweihs simply assumes — having reviewed no evidence — that the first quarter 1993 results were overstated due to the Other Misrepresentations. However, the plaintiffs have never even argued that Jasmine's first quarter 1993 results were misstated due to the Other Misrepresentations.

With no evidence linking the Other Misrepresentations to the market's unfavorable comparison of Jasmine's first quarter 1994 financial results with Jasmine's first quarter 1993 financial results, there is no evidence that the market recognized a relationship between Jasmine's first quarter 1994 financial results and the Other Misrepresentations. Therefore, plaintiffs' argument that Jasmine's first quarter 1994 financial

24

results indirectly disclosed the Other Misrepresentations is unpersuasive.[11]

Plaintiffs also attempt to connect Jasmine's first quarter 1994 financial results to the Misrepresentations by arguing (1) that "the Misrepresentations gave investors the erroneous impression that Jasmine actually had a working business model" (Pls.' Opp. at 2), and (2) that according to Cornell, Jasmine's first quarter 1994 financial results revealed that Jasmine's business model "just didn't work."  However, although the plaintiffs argue that the Misrepresentations were related to Jasmine's business model, they provide no <u>evidence</u> that the market recognized a relationship between the Misrepresentations and Jasmine's business model.  Without that evidence, and because argument from counsel is insufficient to survive summary judgment, plaintiffs' second argument fails.

Without evidence that Jasmine's first quarter 1994 results disclosed the Other Misrepresentations to the market,

_____

[11] This conclusion — that Jasmine's first quarter 1994 financial results did not disclose the Other Misrepresentations — applies to the McKowan Lowe Payable as well.  Although plaintiffs do allege that Jasmine's first quarter 1993 results were misstated as to the McKowan Lowe Payable, the plaintiffs have provided no evidence that the impact of the McKowan Lowe Payable on Jasmine's first quarter 1994 results was different than its impact on Jasmine's first quarter 1993 results.  Because the plaintiffs have therefore not proved that the market recognized a relationship between Jasmine's first quarter 1994 results and the McKowan Lowe Payable, they have not proved that Jasmine's first quarter 1994 results disclosed the McKowan Lowe Payable.

plaintiffs lack evidentiary support for their argument that the statistically significant drop in Jasmine's stock price following disclosure of Jasmine's first quarter 1994 financial results is proof that the Other Misrepresentations caused plaintiffs' loss. Plaintiffs point to no other evidence that the Other Misrepresentations were disclosed to the market during the relevant time period.  Because there is, therefore, no evidence that the Other Misrepresentations caused plaintiffs' loss, summary judgment will be granted in favor of Andersen and the Sands Defendants as to the plaintiffs' 10b-5 claims arising out of the Other Misrepresentations.

### b.   McKowan Lowe Payable

Andersen and Sands argue that although disclosure of the McKowan Lowe Lawsuit on February 2, 1994 was followed by a statistically significant drop in Jasmine's stock price, "plaintiffs suffered no loss caused by an alleged misstatement of the McKowan Lowe Payable."  (Andersen's Mem. at 22.)

In support of their argument, Andersen and Sands cite Dr. Cornell's opinion that the February 5, 1994 price decline "merely represented investors' reserve for the potential economic effects of [the McKowan Lowe Lawsuit].  When [the] lawsuit was later dismissed, this lingering uncertainty was resolved." (Andersen's Mem. at 22 (quoting Cornell Report at 17).)  Because resolution of uncertainty means that "the stock price should rise

by the amount of the uncertainty reserve, all other things held equal" (Cornell Report at 16), Andersen and Sands, along with Dr. Cornell, reason that "plaintiffs in this matter were not damaged" (id. at 17) by any failure to disclose the McKowan Lowe Payable.

In response, the plaintiffs cite Schweihs' opinion: "While the $0.75 per share price decline may have reflected the market's provision for 'uncertainties,' the more important point is that no such decline in the stock price would have occurred if the McKowan debt was not omitted from [Jasmine's] historical financial statements, as alleged by the plaintiffs."  However, Schweihs's opinion is not responsive to Andersen and Sands's position, which is that regardless of whether a misstatement as to the McKowan Lowe Payable caused Jasmine's stock price to decline on February 5, 1994, the plaintiffs currently suffer no injury caused by that misstatement because Jasmine's stock price no longer incorporates that price decline.  Because there is no evidence on the record to contradict Dr. Cornell's opinion that any misstatement as to the McKowan Lowe Payable did not cause the plaintiffs to suffer any loss, summary judgment will be entered in favor of Andersen and the Sands Defendants as to plaintiffs' claims under section 10(b) and Rule 10b-5 arising out of the McKowan Lowe Payable.

### c.   Defendants' Alternate Argument

Andersen and the Sands Defendants also argue that they

are entitled to summary judgment on the Rule 10b-5 claims because
they have proved that the plaintiffs' loss was caused by
Jasmine's poor business results.  (See Andersen's Mem. at 28
(citing Cornell Report at 15).)  Having concluded that Andersen
and the Sands Defendants are entitled to summary judgment on the
plaintiffs' Rule 10b-5 claims for other reasons, this Court need
not reach those defendants' alternate argument.

### 2.   Section 11

"Section 11 of the Securities Act, 15 U.S.C. § 77k,
creates a private cause of action in cases in which a
registration statement either contains an untrue statement of
material fact or omits a material fact that is required or
necessary to make the other statements therein not misleading."
Klein v. Gen. Nutrition Cos., 186 F.3d 338, 342 (3d Cir. 1999).
"To state a claim under section 11, [a plaintiff] must show that
[he] purchased securities pursuant to a materially false or
misleading registration statement."  In re Adams Golf, Inc. Sec.
Litig., 381 F.3d 267, 273 (3d Cir. 2004).  Thus, in contrast with
Rule 10b-5, loss causation is not a necessary element of the
plaintiff's claim.  See 15 U.S.C. § 77k(a).  Rather, under
section 11, a defendant may assert loss causation — more
precisely, the lack thereof — as an affirmative defense.
See Adams Golf, 381 F.3d at 277; see also 15 U.S.C. § 77k(e).

Andersen and Sands argue that they are entitled to

summary judgment on plaintiffs' section 11 claims because they have adduced proof that the Misrepresentations did not cause plaintiffs' losses, "and plaintiffs have adduced no evidence to the contrary."  (See Andersen's Mem. at 14.)

As detailed in Part III.A.1 supra, Andersen and Sands have adduced compelling evidence (1) that the Other Misrepresentations were not disclosed to the market during the relevant time period; (2) that the plaintiffs suffer no current injury as a result of any misrepresentation regarding the McKowan Lowe Payable; and (3) that Jasmine's poor business results, rather than the Misrepresentations, caused Jasmine's stock price to decline.  Therefore, Andersen and Sands have adduced sufficient evidence to establish the "lack of loss causation" affirmative defense under section 11.[12]  Also as detailed above, plaintiffs have adduced insufficient evidence to the contrary. See Goldkrantz v. Griffin, No. 97 CIV. 9075, 1999 WL 191540, at *4, *5 (S.D.N.Y. Apr. 6, 1999) (holding that expert opinion that defendants' event study was "highly suspect" did not create a

_____

[12] "Plaintiffs cite no case holding that a defendant must prove [as an affirmative defense under section 11] 'what other factors' caused a decline; once a defendant shows that the alleged misrepresentation was not the cause of the plaintiffs' losses, its burden is met." (Andersen's Reply at 6.)  See 15 U.S.C. § 77k(e) (stating that a defendant makes out an affirmative defense under section 11 if it "proves that any portion or all of [the plaintiff's] damages represents other than the depreciation in value of such security resulting from [the misrepresentations in] the registration statement").

material issue of fact as to loss causation defense under section
11).

Plaintiffs argue, citing <u>Worlds of Wonder</u>, that
Andersen and Sands cannot satisfy their burden under section 11
by demonstrating that the alleged fraud was not disclosed to the
market during the relevant time period.  Plaintiffs are correct
that to require <u>express</u> corrective disclosure from a <u>defendant</u>
would "eviscerate" section 11, as defendants could then "immunize
themselves from § 11 liability for false and even fraudulent
statements simply by refusing to admit their falsity . . . ."
<u>Worlds of Wonder</u>, 35 F.3d at 1422.  However, this is not to say
that a defendant cannot prevail upon a showing of <u>no</u> corrective
disclosure — direct or indirect, from the defendant or anyone
else.  Because "[t]he market can only react to news when it is
revealed" (<u>see</u> Cornell Report at 25), a defendant who
demonstrates that the fraud was not disclosed to the market
during the relevant time period has demonstrated that the
plaintiffs' loss during that period was caused by factors other
than the fraud.  Where the market never obtains information, it
must be the case that factors other than that information are the
sole cause of plaintiffs' loss.  Thus, a defendant can make out
an affirmative defense under section 11 by demonstrating that the
misrepresentations at issue were not disclosed to the market
during the relevant time period.

For these reasons, summary judgment will be granted in favor of Andersen and the Sands Defendants as to the plaintiffs' section 11 claim.[13]  Also for these reasons, plaintiffs' motion for summary judgment on their section 11 claim will be denied.

**B.   SCIENTER**

Andersen argues that it is entitled to summary judgment on plaintiffs' claim against it for fraudulent misrepresentation because the record contains insufficient evidence that Andersen acted with the requisite scienter.  Both Andersen and the plaintiffs impliedly assume that the state of mind required to make out a claim for fraudulent misrepresentation under New Jersey law is identical to the state of mind required to make out a claim under federal law for violation of section 10(b) and Rule 10b-5.  This Court will therefore do the same.

"Scienter" is a necessary element of a claim for fraudulent misrepresentation under New Jersey law.  See Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624-25 (1981).  Scienter includes both (1) "a mental state embracing intent to

---

[13] In the alternative, summary judgment will be granted in favor of Andersen and the Sands Defendants as to plaintiffs' claims under sections 10(b) and 11 based on the plaintiffs' previous position that "the first notice to investors of the fraud at issue in this case occurred at the time of the BDO Seidman withdrawal" on June 20, 1995.  Although the plaintiffs now argue that the market can correct a stock price before investors receive notice of the relevant information, there can be no loss causation absent disclosure of the fraud to the market.  And, as Andersen argues, "[w]hat is a market if not the sum of investors?"

deceive, manipulate or defraud" and (2) recklessness, defined as
"highly unreasonable (conduct), involving not merely simple, or
even inexcusable negligence, but an extreme departure from the
standards of ordinary care . . . which presents a danger of
misleading buyers or sellers that is either known to the
defendant or is so obvious that the actor must have been aware of
it."  See In re IKON Office Solutions, Inc., 277 F.3d 658, 667
(3d Cir. 2002) (quoting Ernst & Ernst v. Hochfelder, 425 U.S.
185, 193 n.12 (1976) and SEC v. Infinity Group Co., 212 F.3d 180,
192 (3d Cir. 2000)) (alteration in original); In re Phillips
Petroleum Sec. Litig., 881 F.2d 1236, 1246 (3d Cir. 1989).  Where
the defendant is an auditor, scienter requires:

> more than a misapplication of accounting
> principles.  The plaintiff must prove that
> the accounting practices were so deficient
> that the audit amounted to no audit at all,
> or an egregious refusal to see the obvious,
> or to investigate the doubtful, or that the
> accounting judgments which were made were
> such that no reasonable accountant would have
> made the same decisions if confronted with
> the same facts.

See Worlds of Wonder, 35 F.3d at 1426, quoted with approval in
IKON, 277 F.3d at 669.  Thus, "the discovery of discrete errors
after subjecting an audit to piercing scrutiny post-hoc does not,
standing alone, support a finding of intentional deceit or of
recklessness."  IKON, 277 F.3d at 673.  Neither does a "failure
to identify problems with the defendant-company's internal
controls and accounting practices."  See Nappier v.

PriceWaterhouse Coopers LLP, 227 F. Supp. 2d 263, 275 (D.N.J. 2002).

In support of its argument that the record contains insufficient evidence of scienter, Andersen cites the expert opinions of Moskowitz, Westerfield, and Dr. Albrecht: "Where two esteemed accounting professionals [Westerfield and Albrecht] have testified that Andersen met its professional obligations in performing the Jasmine audit and plaintiffs' own expert [Moskowitz] never claims Andersen's alleged departure from GAAS was so extreme as to suggest extreme recklessness, the uncontested facts simply do not suggest a finding of recklessness." (Andersen's Mem. at 36.)  Andersen further argues that the Moskowitz Report cannot support a finding of scienter:

> [W]here plaintiffs' own expert's opinion on
> the underlying accounting issues is so
> ambiguous and ultimately boils down to
> quibbling over accounting treatments, it is
> impossible to see how Andersen could be
> guilty of fraud because, after conducting
> significant audit procedures, its personnel
> exercised their professional judgment and
> came to different conclusions.

(Andersen's Mem. at 36.)  Andersen observes that even when Moskowitz found that Andersen committed a material error, he never testified that the error was intentional or reckless. (Andersen's Reply at 13.)

In response to Andersen's argument that it is entitled to summary judgment on plaintiffs' fraudulent misrepresentation

33

claim because the record contains insufficient evidence that it acted with scienter, the plaintiffs argue that Andersen: (1) "ignored the results of its own audit test[s]" regarding the Shoe Premier Sales, the Angie's Receivable, and the allocation of Jasmine's operating income between foreign and domestic sources; and (2) improperly relied on the representations of Jasmine and McKowan Lowe as to the Lucky Leader Transaction, the Factory Credits, and the McKowan Lowe Payable. (Pls.' Opp. at 6-7.)

In sum, plaintiffs have provided evidence that Andersen's audit failed to comply with GAAS. However, this evidence establishes only that Andersen might have been negligent in conducting its audit. The plaintiffs have provided no expert evidence that Andersen's conduct was reckless or egregious, or that no reasonable accountant would have made the same decisions if confronted with the same facts. Without such evidence, the plaintiffs can not make out scienter: "Because laymen are unfamiliar with an auditor's duties, plaintiffs' failure to put forth expert evidence as to how Andersen's alleged departure from those duties was so extreme as to constitute recklessness or intentional fraud is fatal to their claim." (See Andersen's Reply at 13.) Because the record before this Court contains insufficient evidence that Andersen acted with scienter, Andersen's motion for summary judgment on plaintiffs' fraudulent

misrepresentation claim will be granted.[14]

C.   THEORY OF DAMAGES

Andersen and Sands argue that they are entitled to
summary judgment on plaintiffs' remaining state law claims
because the plaintiffs "fail to offer any theory of damages."
(See Andersen's Mem. at 3 n.1.)   However, in order to satisfy its
initial burden of production under Celotex, a defendant must
either (1) submit affirmative evidence that negates an essential
element of the nonmoving party's claim; or (2) demonstrate to the
Court that the nonmoving party's evidence is insufficient to
establish an essential element of the nonmoving party's case.
Celotex, 477 U.S. at 331.   Because a conclusory argument that the
plaintiffs "fail to offer any theory of damages" does neither,
Andersen and Sands have not satisfied their initial burden of
production under Celotex.   Therefore, Andersen and the Sands
Defendants' motions for summary judgment will be denied as to
plaintiffs' remaining state law claims against them.


IV.        PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The plaintiffs move for summary judgment as to the
class claims under sections 11 and 12(a)(2).   "To state a claim

---

[14] The conclusion that no reasonable jury could find that
Andersen acted with scienter also provides this Court with a
separate, independent reason for granting Andersen's motion for
summary judgment on the section 10/Rule 10b-5 claim.

under section 11, plaintiffs must allege that the purchased securities pursuant to a materially false or misleading registration statement." <u>Adams Golf</u>, 381 F.3d at 273; <u>see</u> 15 U.S.C. § 77k(a). "To state a claim under section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading 'prospectus or oral communication.'" <u>Adams Golf</u>, 381 F.3d at 273; <u>see</u> 15 U.S.C. § 77l. "Sections 11 and 12(a)(2) are virtually absolute liability provisions, which do not require plaintiffs to allege that defendants possessed any scienter." <u>Adams Golf</u>, 381 F.3d at 274 n.7.

Plaintiffs' motion for summary judgment on their claims under sections 11 and 12(a)(2) is based "solely" on the following alleged material misrepresentations in Jasmine's 1993 financial statements:

1.    "[T]he $636,000 overstatement of Jasmine's 1993 U.S. operating profits, and corresponding understatement of non-U.S. operating profits";

2.    "[T]he $13.3 million understatement of Jasmine's debt to McKowan";

3.    "[T]he failure to disclose that Jasmine's relationship with McKowan, upon whom Jasmine was dependent, was deteriorating"; and

4.    "[T]he failure to disclose that Jasmine's 1994

36

first quarter results, a quarter which was all but complete by
the December 15, 1993 IPO, were worse than the previous year."
(See Pls.' Mem. at 1-2.)

### A.   JASMINE'S OPERATING PROFITS

Plaintiffs argue that the alleged $636,000
misallocation of Jasmine's 1993 operating income was material as
a matter of law because it (1) exceeded the $100,000 threshold of
materiality Andersen used for accounting purposes and (2)
"misrepresent[ed] the viability of Jasmine's business model."
(Pls.' Mem. at 10.)  However, the record contains significant
evidence that the alleged misallocation was not material.  (See
Westerfield Dep. at 304-05 ("I don't think the disclosure of the
foreign segment data if there is an error in it is material to
these financial statements."); see also Moskowitz Dep. at 61
(refusing to render an opinion as to whether the allocation at
issue constituted a material misstatement).)  Because there is a
genuine issue of fact as to whether this alleged misstatement was
material, plaintiffs' motion for summary judgment, as it relates
to the allocation of Jasmine's 1993 operating income, will be
denied as to all defendants.

### B.   MCKOWAN LOWE PAYABLE

Plaintiffs argue that the alleged $13.3 million
understatement of the McKowan Lowe Payable was a material
misstatement as a matter of law because it (1) exceeded the

$100,000 threshold of materiality Andersen used for accounting
purposes and (2) "turned a net deficit of over $10 million into a
net worth of $1.3 million." (Pls.' Mem. at 15.) However, the
record contains evidence that the McKowan Lowe Payable was
reflected correctly in the financial statements accompanying
Jasmine's registration statement and prospectus (see Feeney Decl.
Exs. 1-6), thus establishing a genuine issue of fact as to
whether the McKowan Lowe Payable was misstated.

In response, plaintiffs contend that "Defendants cannot
rely upon McKowan's false confirmation to Andersen" because "[i]t
is uncontested that the confirmation was concocted as part of the
conspiracy to conceal the side loan from the auditors." (Pls.'
Reply Against Ciocco, Mangel, and Mangel at 5.) Plaintiffs thus
attempt to fit the facts of this case into In re Livent, Inc.
Noteholders Securities Litigation, 355 F. Supp. 2d 722 (S.D.N.Y.
2005), in which a court in the Southern District of New York
found that documents characterizing a transaction as an
investment rather than a loan did not, in the face of undisputed
evidence that "secret side agreements" guaranteed repayment,
create a jury question as to whether the transaction was in fact
a loan. Id. at 731. Here, plaintiffs offer evidence[15] that

---

[15] Andersen argues that the evidence submitted by plaintiffs
in support of their motion for summary judgment as it relates to
the McKowan Lowe Payable is inadmissible because it is (1)
unauthenticated and (2) hearsay, at least as against Andersen.
Because plaintiffs' motion as it relates to the McKowan Lowe

Jasmine owed McKowan Lowe an additional $13.3 million.  (<u>See</u>
Moynihan Decl. Ex. 28.)  Although the record contains evidence
that this debt did not in fact exist, plaintiffs appear to
contend (through their citation of <u>Livent</u>) that this evidence
does not create a genuine issue of fact because it does not
contradict the record evidence of a "side loan" from McKowan
Lowe.  However, although the record does contain evidence of such
a side loan, it was not entered into by Jasmine.  (<u>See</u> Moynihan
Decl. Ex. 28 at Ex. E ("Agreement" between Lujaco and McKowan
Lowe).)  Therefore, this case is distinguishable from <u>Livent</u>
because there remains in this case a genuine issue of fact as to
the amount of Jasmine's debt to McKowan Lowe.  Because there is
therefore a genuine issue of fact as to whether the McKowan Lowe
Payable was misstated, plaintiffs' motion for summary judgment,
as it relates to the McKowan Lowe Payable, will be denied as to
all defendants.

## C.   JASMINE'S RELATIONSHIP WITH MCKOWAN LOWE

Plaintiffs argue that the failure of Jasmine's
registration statement and prospectus to disclose that "Jasmine's
relationship with McKowan Lowe was deteriorating" amounted to a
material misstatement as a matter of law.  (Pls.' Mem. at 16.)
First, plaintiffs quote Jasmine's registration statement in

_____

Payable will be denied as to all defendants, this Court will not
decide the admissibility issue at this time.

support of their argument that the relationship itself was

"undoubtedly material":

> . . . the loss of [McKowan's] services could
> adversely affect [Jasmine's] relationships
> with its manufacturers and could <u>materially</u>
> interrupt [Jasmine's] operations, including
> causing delays in the manufacturer [sic] or
> delivery of [Jasmine's] products, any of
> which would have a <u>material</u> adverse effect on
> [Jasmine].

(<u>Id.</u> (quoting Jasmine Registration Statement at 8) (alterations

in original).)  Next, in support of their argument that the

relationship was in fact deteriorating, plaintiffs cite evidence:

(1) that Jasmine started funding Lucky Leader in 1992 to create a

replacement for McKowan Lowe; (2) that Jasmine believed that

McKowan Lowe was improperly overstating the amount it paid to

factories for Jasmine's shoes; and (3) that the Jasmine/McKowan

Lowe relationship did in fact end six months after Jasmine's IPO.

(Pls.' Mem. at 15-17.)  According to the plaintiffs: "[W]arning

investors about the material adverse consequences of an

occurrence, but failing to inform investors of facts that reveal

an increased likelihood of that event occurring constitutes an

omission of a material fact required to be disclosed to make the

warning not misleading."  (Pls.' Mem. at 17.)

However, the plaintiffs point to no evidence

demonstrating the <u>extent</u> of the increased likelihood — posed by

Jasmine's funding of Lucky Leader and its belief that McKowan

Lowe was misstating amounts paid for shoes — that Jasmine's

relationship with McKowan Lowe would end.  Nor do the plaintiffs
point to any evidence showing that the eventual end of the
relationship was at all precipitated by Jasmine's funding of
Lucky Leader or its belief that McKowan Lowe was misstating
amounts paid for shoes.  Without evidence as to the extent of the
increased likelihood posed by these "facts" that the relationship
between Jasmine and McKowan Lowe would end, the plaintiffs have
not demonstrated the lack of a genuine issue as to whether a
reasonable investor would consider those facts important in
deciding how to act.  Thus, there remains a genuine issue as to
whether the omission of these facts was material.  See TSC
Indus., Inc. v. Northway Inc., 426 U.S. 438, 449 (1976)
(instructing that "[a]n omitted fact is material if there is a
substantial likelihood that a reasonable [investor] would
consider it important in deciding how to [act]").  Therefore,
plaintiffs' motion for summary judgment as it relates to
Jasmine's relationship with McKowan Lowe will be denied as to all
defendants.

### D.   JASMINE'S 1994 FIRST QUARTER RESULTS

Finally, the plaintiffs argue that the failure of
Jasmine's registration statement for the December 15, 1993 IPO to
include information on Jasmine's sales and earnings for the
quarter ended December 31, 1993 constituted a material omission
as a matter of law.  (Pls.' Mem. at 17.)

41

"[A] defendant is not required to disclose all known information, but only information that is 'necessary to make other statements not misleading.'"   In re Children's Place Sec. Litig., 1998 U.S. Dist. LEXIS 22868 (D.N.J. Sept. 4, 1998); Zucker v. Quasha, 891 F. Supp. 1010, 1014 (D.N.J. 1995); see Craftmatic Sec. Litig. v. Kraftsow; 890 F.2d 628, 641 & n.17 (3d Cir. 1989) ("Disclosures mandated by law are presumably material. However, when defendants voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact.").  Thus, in order to demonstrate that an omission was "material" under sections 11 and 12(a)(2), a plaintiff must either show that disclosure of the omitted fact was mandated by law or "identify an affirmative statement that is made misleading by the material omission."  See id.

The plaintiffs argue that omission of Jasmine's first quarter 1994 financial results from Jasmine's registration statement and prospectus was material as a matter of law, even though the quarter was not yet complete at the time of the IPO, because (1) "without disclosure, Defendants were able to further the misperception that Jasmine's business model was working" and (2) the omission "concerned Jasmine's earnings, which the Third Circuit has made clear is information that investors will likely consider 'highly material.'"  (See Pls.' Mem. at 18 (citing In re

42

Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 n.9 (3d
Cir. 1997)).)  However, these arguments neither show that a
prediction as to Jasmine's first quarter 1994 financial results
was either mandated by law nor identify an affirmative statement
made misleading by the omission.  Further, Burlington Coat
Factory does not state that the omission of a prediction as to
future earnings is material.  Rather, that case states:
"[I]nformation about a company's past and current earnings is
likely to be highly 'material.'"  Id. at 1421 n.9 (emphasis
added).  Therefore, the plaintiffs have not established the lack
of a genuine issue of fact as to whether a failure to include
information on Jasmine's sales and earnings for the quarter ended
December 31, 1993 in the registration statement and prospectus
constituted material omission.  For this reason, plaintiffs'
motion for summary judgment as it relates to Jasmine's first
quarter 1994 financial results will be denied as to all
defendants.

### E.   DEFENDANTS' REMAINING ARGUMENTS

Because the plaintiffs' motion for summary judgment on
the class claims under sections 11 and 12(a)(2) will be denied
for the reasons stated above, this Court need not reach the
remainder of the defendants' arguments in opposition to the
plaintiffs' motion.

**V.**      **CONCLUSION**

For the reasons expressed in this opinion:

1.    Andersen's motion for summary judgment will be granted in part as to the section 10/Rule 10b-5, section 11, and fraudulent misrepresentation claims; and Andersen's motion for summary judgment will be denied in part as to plaintiffs' remaining state law claims against Andersen;

2.    The Sands Defendants' motion for summary judgment will be granted in part as to the section 10/Rule 10b-5 and section 11 claims; and the Sands Defendants' motion for summary judgment will be denied in part as to the section 12(a)(2) claim and plaintiffs' remaining state law claims against the Sands Defendants; and

3.    Plaintiffs' motion for partial summary judgment will be denied.

The accompanying Order shall issue today.


Dated:    June 30, 2005              /s/ Robert B. Kugler
                                ROBERT B. KUGLER
                                United States District Judge

44